Our second case is Markle v. Markle. Mr. Tickton? Yes, sir. Thank you, Your Honor. I represent Samantha Markle. In reading over the answer brief, I realized that this case, more than any other case that I came across, and all the research I've done or otherwise, is a smorgasbord of all kinds of defenses. It's the handbook. Well, first, can you start with some clarification for me? One, we're only here on appeal on defamation by implication, right? Yes. And is it not correct that in the complaint, the statements you claim are false, but now on appeal, you're claiming they're true? How are you characterizing the statements at issue here now? Well, a number of them are true. We explained in our opening brief which ones are true. The fact of the matter is we are capable of being convinced of certain things from judges' orders and from opposing counsel. Some things sometimes are a little bit fluid. But what happened in this case, which is really interesting, if I may, because I have a different slant on it than anything you've read on this case yet. Well, I just want to clarify for purposes of appeal then, so if we are analyzing the statements in the same way that they were presented to the district court? This is not a repeat of what was in the district court because this case is completely different. This case has all the different factors. If somebody had a manual on how do you hurt somebody and escape the liability of having a claim against you for defamation, this is the case because everything's in here. It's a smorgasbord of every single kind of way of avoiding liability all mixed in one when the whole purpose was to actually destroy Samantha Markle. There were two things that were the objects of it. But if I could just very quickly go through what I'm talking about here. For instance, we have words with no precise definition that are used. They knew to use words like disinformation or racist troll so that, hey, we can't be liable for those. They knew the rules. Mr. Titkin, I have a more fundamental problem with this case, which is the district court, it appeared to me, had an alternative ruling that these were protected opinions and you didn't challenge it in your opening brief. No, because many of these things are opinions. Well, guess what? If that's a separate and independent ground, an alternative holding, then it requires affirmance if you haven't explained in your opening brief the error. I mean, it seems to me that everything you argue about is beside the point because when the district court rules, if the district court has an alternative ruling, you have to knock down in your opening brief every basis for the district court, truly. You didn't even touch this. No, because what happened here, if I may, the opinion such as she's somebody I don't really know her, that's an opinion. It is an opinion. Of course, I'm not going to argue with her on her and say that it is once I realize that that really is an opinion. There's vagueness, like I was only a child. There's don't say things yourself, get Mr. Boozy to say it. It's every avoidance of liability are laid out here as though there was a lawyer there on the set saying, don't say that, say this. This is what you can say. The established defense of . . . How is that actionable? You've just said that Meghan Markle had a lawyer who was effectively advising her on how to avoid any liability for defamation by implication. Why doesn't that mean you lose? Because you just can't do . . . There's an old saying, there's no right way to do a wrong thing. Even though the council may have said, okay, say it this way, it's an opinion and so on, when you put it together, that's why we're looking at this thing from an implied liability point of view because that's what it is. Don't say it yourself, get Boozy to say it. Use the established defense of using the . . . say the things are in groups, top it off with squeezing and a denial by the victim. Every single thing that you can find in all the other cases are in this one case, but it doesn't work. The reason it doesn't work is because . . . You're suggesting that each of these opinions or get someone else to say it or talk about a group, they may be completely lawful by themselves, but when you string them all together, there's a problem. That's exactly it. I don't understand that argument. If they're all lawful individually, how do you get to liability? Because when you take a bunch of things that are lawful and even true and you put them together in a way that infers something else, then that's there and that's what I need to show. It's sort of like my dog. If I throw a ball to my dog in the high grass, my dog knows how to find that ball directly. But very often, instead of finding the ball, she gets distracted by all the flowers that are around it. That's what these all are. The fact that there's an opinion doesn't mean that the underlying ball of harm isn't there. The two things that they needed to bring, the plot, was don't break any of these rules, but basically infer, show that I don't know her, therefore she doesn't know me, therefore don't buy her book because she doesn't know me at all. She's only an opportunist. And this is what's inferred. Also, this is somebody who belongs to a group. And some of these things don't add up as well. It was a lawyer that made mistakes in what he was judging or advising them or an imaginary lawyer advising them because some of the things don't make sense. For instance, a group, there's two kinds of groups. If you belong to a group of people that have Confederate flags, sure, that doesn't mean you're a racist. There are some people that have Confederate flags that are, some that aren't. That doesn't prove anything. Okay, so you're saying that all of these statements, okay, I think there's a lot of problems, right? There's number one, the alternative grounds. There's the fact that you said some of the facts were, some of the statements were false and now you're saying they're true. And now in terms of the of and concerning your client, I mean, they're talking about trolls. There's an expert who's a cybersecurity person. So it seems like it would make sense that Ms. Markle would rely on Mr. Boozy's statements. So how is all of this still of and concerning just your client? Okay, well, that last point you raised, you know, Meghan Markle knew that there were no, I mean, she had to know that none of the tweets of the thousands of tweets that were made about her weren't from her sister. They knew all the names of all the different accounts that the sister had. And they couldn't point to one thing that the sister said. It was a smear campaign against her sister. And she knew what she was saying. She knew it was a severe campaign at the time. The fact is these things were inferred from all the things that were said. It doesn't matter that the word was used of that it's disinformation, you know, and that's attacked. It doesn't matter. The group thing, by the way, doesn't make any sense either. You know, if you're defined in the group, for instance, if we have a group of judges that wear red shoes, the one thing we know about those judges that put them in the group is that they're wearing red shoes or they do wear red shoes. If the group is defined by a particular thing, that thing is an accusation. So it's not... That's of and concerning because your client was part of those groups and therefore any comments related to those groups are of and concerning your client. Not so. I'm sorry, Your Honor. She was not a member of the group because she never wrote a text negative to Meghan Markle. And the group was defined. You have a bunch of people in a group that are sending negative texts or disingenuous or rather disinformation to Meghan Markle, about Meghan Markle. But there was never any tweet that was ever made by Samantha Markles. She never did such a thing. And so how do you say, well, I didn't bother to look to see if there were any from her? I mean, that's silly. The fact of the matter is that... I'm sorry. Just please finish. I know I'm walking into a tough situation here. But if this court does stand for the fact that there's no right way to do a wrong thing and people shouldn't be able to manipulate and use these rules to find a way around it to cause that kind of harm to a lady who's in a wheelchair because she's got multiple sclerosis and destroy her life so she has to live with death threats, it caused her to have the misery in her life. And that's what defamation is about, unfortunately. Mr. Tickton, you've saved some time for rebuttal.   Thank you. Good morning. May it please the court, my name is Michael Kump and I represent the defendant, Pelley Megan Markle. I think, to state the obvious, this case is about the Third Amendment complaint. It is not about the new claims and allegations that are contained in the appeal briefs. Wouldn't the cleanest way of resolving this case be that Samantha did not attack the alternative ruling? Yes, Your Honor. That's an independent ground that had to be attacked. Because she didn't, we have to affirm. I picked up on this point in the recent opinion by this court a couple of months ago in Reed v. Chambly. In footnote number five, the court cited to Sapupo v. Allstate, which I think, Your Honors, I'm sure you're referring to, which says, quote, when an appellant fails to challenge properly on appeal, one of the grounds on which the district court based its judgment, he is deemed to have abandoned any challenge on that ground and it follows that the judgment is due to be affirmed. Immediately before, it says, to obtain reversal of a district court judgment that is based on multiple independent grounds, an appellant must convince us that every stated ground for the judgment against him is incorrect. Correct. Yes. As I understand it, your opposing counsel concedes that there was nothing in the brief that attacked that independent ground. Yes, in this appeal, the plaintiff has completely abandoned any appeal of count one for express defamation and as a result, that will be affirmed. The plaintiff expressly concedes that all 18 plus express statements alleged in the third amendment complaint by Megan and by Mr. Buzzi are not actionable. That is conceded. The only appeal here is from a portion, a limited portion of count two for defamation by implication and it's an appeal limited to a few proposed implications proposed by plaintiff based upon Mr. Buzzi's few comments. Mr. Buzzi spoke for a total of about one minute in the 49-minute episode. As a result of this limited appeal, Megan is actually no longer being sued for any of her statements expressed or implied. She's being sued solely on a, with all due respect, convoluted theory of vicarious liability. All of those statements the district court ruled were also not defamatory for the same reason as those that the district court had resolved that issue as to count one, right? That is correct, Your Honor. We went through three complaints. There's no attack of that reasoning. Right. In connection with the motion to dismiss the third amendment complaint, we had our motion. They had an opposition. We had a reply. They even had a surreply which is pretty rare in the district court. All of these issues, we spent all of this time litigating about what was defamatory. Again, in their appeal brief, they come forward and say, well, there's actually 15 true statements in the third amendment complaint. I go, where? I can't find. There's close, and I counted them myself, there's close to 40 references in the third amendment complaint to false statements. There's not a single reference to a true statement in there at all. Can I ask you a question related to the false statement versus true statement? This is a question about the district court citation of a Florida case, the Rapp case. Yes, Your Honor. Do you have any Florida case explicitly holding that statements giving rise to defamation by implication have to be literally true? I know in Rapp, there are general statements that literally true statements can be defamatory where they create a false impression. I'm trying to figure out, is there a Florida case dismissing a defamation by implication claim because the statements alleged to give rise to the implication were false? I think the Florida Supreme Court opinion in the Rapp case is certainly the starting point. That recognized the claim of defamation by implication. The court there, the Florida Supreme Court, which of course governs here, was very clear.  Defamation by implication applies in circumstances where literally true statements are conveyed in such a way as to create a false impression. That statement, to me at least, does not foreclose claims based on literally false statements. I think it does though with respect to defamation by implication. Again, defamation by implication, one of the things I would say is that this case has always been, in all three complaints, this case was about two things. Alleged false statements, which were allegedly motivated by alleged personal animosity and ill will. We all know that personal animosity and ill will has nothing to do with actual malice because this court has cited that numerous times. The alleged false statements again are statements, because Florida law is clear, falsity is a necessary element of a claim. I am not aware of any, and again, I'm not aware of any Florida case that has held that any false statement could give rise in any sort of way to a claim for defamation by implication. The whole idea of defamation by implication, at least the way the Supreme Court defined it there in RAP, is that you have these true statements that are either juxtaposed in a certain way or omit certain facts in a certain way to give rise to what are arguably defamatory implications. But again, the implications have to be defamatory. If the district court here ruled that they're not actionable, then they're not actionable as defamatory implications, and that hasn't been that challenge. Just to sort of quickly summarize my question, so you're only pointing to RAP for this true versus false? I am. That is correct, Your Honor. And again, obviously part of the reason I'm doing that is the Turner v. Wells case of this circuit was very clear in these kinds of defamation cases that the court is required to apply the law of Florida and as expressed by the Florida Supreme Court. And I think RAP is clear on that. Other courts in this circuit have followed RAP in that regard. Corsi v. Newsmax Media, which we cite, goes to that ground as well. What I'd like to say, Your Honor, is that the district court's dismissal of count two for defamation by implication should be affirmed on at least three independent grounds. First, the plaintiff has failed to plausibly allege... excuse me, plausibly plead actual malice because the plaintiff has not alleged sufficient facts to give rise to the reasonable inference that Megan had obvious reasons to seriously doubt the veracity of anything that Mr. Buzzi said. Where his statements were, first of all, accompanied by an on-the-air or on-the-record statement from plaintiff's attorney setting forth plaintiff's position. That's right in the middle of the Netflix series. And separate from that, there was also all of the prior media reports regarding plaintiff's online activities of which the district court took proper judicial notice. The second independent ground for affirming, Your Honors, is, again, under the RAP opinion, is that claim of defamation by implication can only be based upon, quote, literally true statements. And here, all of the statements alleged in the complaint are alleged to be false. Now, it's true that in their appeal brief, they try to argue that, well, there's actually a couple of true statements and there's a couple of false statements which could support the claim of defamation by implication. But, number one, those arguments were not presented in the court below and thus are waived. And secondly, they are contrary to Florida law, which obviously governs here. And third, even if plaintiff had, in fact, identified and relied upon any true statements as required, the defamatory implications that they propose are, as a matter of Florida law, non-actionable opinions that are protected, both by Florida law and the First Amendment. So, for example, throughout the Third Amendment complaint, plaintiff throws out a number of what I would call hyperbolic terms that she claims were implied by false statements that were made about her. Claims such as, and these are taken directly from the Third Amendment complaint, charlatan, fame seeker, agent provocateur, racist, fabricator of stories, liar, and so forth. But under Florida law, as recognized in Turner v. Wells, plaintiff's proposed implications fail because they are not readily capable of being proven true or false. And, for example, Mr. Boozy, in his limited comments, did not call anyone or refer to anyone as a racist or as a racist troll. By the way, racist troll does not appear anywhere in the Third Amendment complaint. But in any event... Well, no, I thought he does say that a lot of the messages were about hatred, and then there are comments about them coming mostly from middle-aged Caucasian women. So, to your earlier point, we look at the context, and then we know who Samantha Markle is. How is that not an implication that she, too, is trolling Ms. Markle, that she's a racist, and all these other things? And I understand the point, Your Honor. My point was that he actually never used the term racist or racist troll in his comments. But in any event, the Florida Court of Appeals had recently held in 2023, in a case there, that the term racist tirade was non-actionable and was a matter of opinion and would not support a claim for defamation or defamation by implication. And obviously, if the term, for example, racist tirade, is protected under Florida law, then terms such as charlatan and fame-seeker and such are also protected as well. And thus, for all of these reasons, the court's dismissal of the count to for defamation by implication should be affirmed. Now, with respect to actual malice, I just want to say a couple of things about that. Again, in order to plead here where Megan is only being sued vicariously, the plaintiff needed to allege that there were sufficient facts to support a reasonable inference, that she had obvious reasons to seriously doubt the veracity of what Mr. Boozy said. That's from the St. Amant opinion by the United States Supreme Court, which has been cited by this court as well. And there's not a single allegation anywhere in the Third Amendment complaint that suggests, even remotely, that there were obvious reasons why she should have doubted what Mr. Boozy said. In fact, there's many reasons that are stated in the record as to why Megan had many grounds to rely upon what Mr. Boozy said. For example, Episode 5 of the Netflix series in which Mr. Boozy appears, of which the district court properly took judicial notice, expressly identifies him and his company as experts in the area of analyzing social media. And plaintiff, in her opening appeal brief, heralds Mr. Boozy as, quote, one of the foremost experts on hate groups operating on Twitter. That's at page 24 of her brief. And, quote, an expert in cyberbullying and online hate groups. That's at page 27. In other words, even plaintiff recognizes that Mr. Boozy is trustworthy. And the court cannot and should not rely upon the allegations that plaintiff makes for the first time in their appeal brief. For example, they say, well, Megan should have known that there were problems with Mr. Boozy's report. Megan should have looked into those, etc., etc. Nothing like that is alleged anywhere in the Third Amendment complaint. And therefore, any such arguments have been waived. But in any event, this court has previously held, for example, in the Michelle v. NYP Holdings case, that a failure to investigate before publishing does not indicate the presence of actual malice. There needs to be something much more than that. There needs to be a showing that the, for example, that the defendant purposefully avoided doing any further investigation to discover the truth. Obviously, we don't have anything like that alleged here. With respect to actual malice, another thing which I think is also important, separately, is the fact that the Netflix series also included an express statement from plaintiff's own attorney on what plaintiff now claims is the key issue here, namely the status of her Twitter accounts. And this court has held in numerous cases that when a publication or a broadcast presents contrary positions or contrary points of view, that undermines any claims of actual malice. That was the Turner case, the Michelle case, Jacoby v. CNN. And here, plaintiff just has never addressed and said anything about the onscreen statement that comes right in the middle of Mr. Buzzi's comment. And this is a statement that is attributed to plaintiff's attorney, which says, quote, according to Samantha Markle's attorney, Samantha's Twitter account has never been, quote, but was instead, quote, hacked, resulting in, quote, imposter accounts. In other words, the series left it up to the viewer to listen to the respective explanations and make their own decisions, which undermines any claim of actual malice. And finally, it was also well established under the Rosanova case, which this court just applied in just last year in the Moore v. Cecil case, that when you have actual malice regarding a source, it cannot be found where there have been prior reports of the same activity. And in connection with our motion to dismiss the Third Amendment complaint, we filed with the district court a request to take judicial notice of certain publications. At the oral argument that we had, plaintiff's counsel did not oppose that, and as a consequence, the district court took judicial notice of a number of publications which are listed in our request for judicial notice, which is part of the record here. And all of these publications, which were prior to the Netflix series, established that plaintiff had made false and misleading comments online many times about Meghan. For example, one of the articles that the district court properly took judicial notice of was a March 2022 article from BuzzFeed News. Again, this was prior to the Netflix series, which was titled, quote, Meghan Markle's Biggest Troll is Her Half-Sister Samantha, unquote. And so under Rosanova and its progeny, the previous media reports undermine any claim of actual malice. And so for all of these reasons, the plaintiff has not and cannot plead actual malice here. Well, but does that speak to the issue of the of and concerning? Given the publications that identified Samantha Markle as a troll, and then you have an expert who comes and talks about trolls, how is that not of and concerning Samantha then? Well, of and concerning is a wholly separate... So actual malice is a separate ground unto itself. Right, I understand that. But just with 14 seconds left, just trying to make sure I understand that point. Yes. You know, what I would say about of and concerning is that of and concerning was much more important when there was the first cause of action for express defamation. That's really where we relied upon that. Once they decided not to appeal that, the of and concerning became of less concern because now we're just talking about implications. I thank you. Thank you very much, Your Honor. Thank you, Mr. Titkin. You've saved five minutes. Thank you, Your Honor. You know, the point is that it's all the comments that are taken together. It's not any one of them. So, you know, to give you an example, you know, Samantha Markle was part of a group that was putting out a lot of disinformation. Look at that one thing all by itself. And it's not defamation. But when you combine it with that she's putting out tweets that basically say, why don't you die? How could a half-sister of Megan be part of a hate group accusing her of being in a hate group? You know, you combine that for the main hate accounts, the primary motive is monetizing this stuff, but the secondary accounts, it's all about hatred, it's all about, you know, you know, race. So when there can be derogatory terms that can use the N-word on tweets. You're making people want to kill me. It's not just a tabloid. You're making people want to kill me. She's talking to her sister and telling her sister that. Altogether, it caused death threats. It caused her sister to be a hated person in the community. So, you know, this is the model of the example of how you get away with destroying somebody's life by looking at the rules really carefully and making sure that you put it together. But the inference, that's why we gave up on the first part of the case with the express defamation. It's because it's all the inference. That's that ball in the grass. That's what you need to look at. How did it make this woman, how did it destroy her life? It destroyed her life by the cumulative effect of all the remarks that were made in that period of time. Okay, but how do you deal with the waiver issues? Maybe you did address it and I missed it, but you've got the alternative grounds that the district court relied on, which it sounds like you never responded to, and then you've got statements that you've now converted on appeal to be true in further support of your defamation by implication claim, which some would argue, then you've also waived the ability to present that on appeal. So what is your response to the waiver arguments? Frankly, I'm only going to speak truth to this court or anyone else. The way this occurred, the way it was set up, we were all distracted by the flowers, looking at the different flowers, we missed the ball. And it's not too late. The ball is there. The implication of the fact that this is an awful person because she sends these tweets that was basically put out by a person who knew that she never put out any such tweets, getting right down to the very basic aspect of what the lie is, what the defamation really is. It really boils down to two things, that and the fact that she doesn't know this person, therefore she's an opportunist, implying that she's an opportunist. So if we would have thought of this thing through a little bit better in the first place, instead of chasing after all the different aspects of the case, the way we fell into the trap, we played into their hands of what it was that was the basis of this defamation. And now we have somebody who put this out to millions and millions of people that's now going to get away with it because we made that mistake. Unless this court realizes that I'm right about the implication part of it. And we didn't waive the implication part of it. We do waive the express part of it. You waived the alternative ground for the dismissal of it. You made no argument for why the alternative holding for dismissing the defamation by implication claim is erroneous. You made no argument for that. The brief was prepared with the understandings that were had at the time by the attorney that prepared the brief. Okay, Mr. Tickett. I think we understand your case. Is there anything else you want to tell us in the last thirty seconds? Only that I'm hoping that your honors can see that the waiver may have applied to the express part of the case but not . . . Look, when you come to us and you're asking us to reverse a district court, the district court has worked hard on it and explained all the basis for its rulings. We accord the district court the respect of seriousness, serious treatment as to all of those rulings. If you haven't attacked one of the alternative grounds of the district court's ruling, I don't see how we can fault the district court for having reached the judgment that it reached. I understand that but I also . . . and of course you should . . . it's only appropriate that judges work very hard. I know my daughter was a judge. You get to know it once you have a family member that works as hard as the judges do work and I know your honors also work very hard. I respect that position. At the same time, there's a tremendous burden on this court to straighten out the law of the Eleventh Circuit and to make sure that . . . We should do that in a case where the issues are properly presented to us. Thank you, Mr. Dedkin. Thank you, your honor. I do appreciate your time and attention.